**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Southern Counties Oil Company, | No. CV-18-02307-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Lucas Henry, et al., | |
| Defendants. | |

## INTRODUCTION

Southern Counties Oil Co. ("Plaintiff" or "SC Fuels") employed Lucas Henry, Thomas Parsons, and Christopher Reinesch (together, "the Individual Defendants") until they left to work for competitor Fuelco Energy LLC ("Fuelco") at various points in 2018. In this action, Plaintiff alleges that the individual Defendants provided confidential and trade secret information to Fuelco, in violation of the Individual Defendants' confidentiality, non-competition, and/or non-solicitation agreements, and that the Individual Defendants and Fuelco (collectively, "Defendants") used that information to commit various business torts. (Doc. 55.)[1]

---

[1] Plaintiff includes the following summary of its claims in its operative pleading, the Second Amended Complaint ("SAC"): "Fuelco recruited and hired Defendants Henry, Parsons, and Reinesch away from SC Fuels, has obtained from these individual defendants, SC Fuels' confidential, proprietary and trade secret information and is now actively using such information to unlawfully compete with SC Fuels and solicit its customers and business away. In addition, . . . Fuelco is aware of certain contractual agreements these individual defendants previously entered into with SC Fuels while still employed, which Fuelco is actively inducing and encouraging them to breach." (Doc. 55 ¶ 5.)

The discovery process in this case took an unexpected turn when Thomas Gibson, Fuelco's Rule 30(b)(6) representative, disclosed the existence of two documents—an Excel spreadsheet and a Word document (together, "the Business Case Documents")—that he had used to propose an expansion of Fuelco's operations into Arizona and Colorado in early 2018.  During the deposition, Gibson suggested that he had been in contact with Parsons and Henry while they were still employed by Plaintiff and that Parsons and Henry had helped "populate" the sales projection data that appeared in the Business Case Documents.  This was a potentially explosive admission because it suggested that Parsons and Henry had been leaking Plaintiff's sensitive information to a potential competitor while still employed by Plaintiff to assist that competitor in deciding whether to expand into Plaintiff's territory.

Because the existence of the Business Case Documents had not been previously disclosed to Plaintiff, Plaintiff's counsel requested their immediate production.  Six months later—and only after multiple follow-up requests by Plaintiff's counsel—Defendants produced a .pdf copy of a PowerPoint presentation and stated that it was the document to which Gibson was referring during the Rule 30(b)(6) deposition.

Dissatisfied with this explanation, Plaintiff filed a motion for discovery sanctions, arguing that the PowerPoint could not possibly be the Business Case Documents (because, among other things, it was in a different format than the Word and Excel documents Gibson previously described and seemed to post-date Gibson's account of when those documents were created).  To resolve the parties' dispute over this issue, the Court ordered forensic imaging of certain email accounts and hard drives belonging to the Individual Defendants and Gibson.

The discovery process took a further unexpected turn during the forensic imaging process.  Many months after the Court issued the imaging order, Defendants revealed for the first time that Parsons's and Henry's hard drives had been lost and that Gibson's computer had been replaced at some point due to a virus (although Defendants contend it was duplicated and is functionally identical to his prior laptop).

Based on these developments, Plaintiff has now filed a renewed motion for sanctions.  (Doc. 188.)  For the following reasons, the motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

I.   The Individual Defendants' Employment At SC Fuels And Fuelco

Henry worked as Plaintiff's business development manager from February 2014 until April 2, 2018, "when he abruptly resigned his position to work for" Fuelco.  (Doc. 55 ¶ 2.)  Henry then worked for Fuelco from April 9, 2018 until January 30, 2020.  (Doc. 204-2 ¶ 2.)

Parsons worked as Plaintiff's site manager from January 2017 until March 22, 2018, "when he abruptly resigned his position to work for" Fuelco.  (Doc. 55 ¶ 2.)  Parsons then worked for Fuelco from April 2, 2018 until July 8, 2019.  (Doc. 200-3 ¶ 2.)

Reinesch worked as Plaintiff's sales representative from January 2013 to June 26, 2018, "when he resigned his position to work for" Fuelco.  (Doc. 55 ¶ 4.)  During oral argument, defense counsel confirmed that Reinesch no longer works for Fuelco.

II.   The Revelation Concerning The Business Case Documents (June 2021)

On June 30, 2021, Plaintiff deposed Fuelco, with Gibson serving as Fuelco's Rule 30(b)(6) representative.  (Doc. 192-1 at 21, 28.)  Gibson testified that he and Keith Maxwell, Fuelco's CEO, began discussing Fuelco's potential expansion into Arizona in "late 2017 or early 2018."  (Id. at 30.)  Fuelco had not previously conducted any business in Arizona.  (Id. at 29-30.)  Around the same time, Gibson connected with Parsons about potentially working for Fuelco.  (Id. at 30-31.)  According to Gibson, Parsons "[knew] customers and sales personnel in the industry in the Phoenix area that [Fuelco] could possibly use to expand [its] business."  (Id. at 30.)

To assess the feasibility and potential associated with the Arizona market, Gibson "prepared a . . . financial business case to review with Mr. Maxwell" sometime in "early 2018."  (Id. at 31.)  As discussed below, Gibson later clarified that "the business case that was . . . submitted to Mr. Maxwell included . . . two components[.]  One was a Word

document that included the narrative, and then the other was [an] Excel spreadsheet that included the projections." (*Id.* at 37.) When asked to elaborate, Gibson said, "I do not recall the specifics of those pro formas. But generally, it was just . . . a financial projection of an expansion into . . . what we internally call the southwest region." (*Id.* at 31.) Gibson confirmed that the Business Case Documents did not include "customer specificity" and the projections within them were largely based on "[v]olumes and margins." (*Id.*) Gibson also stated that the margins were determined through conversations with Parsons. (*Id.*) He further testified that the first time he spoke with Parsons was "January or February of 2018." (*Id.*) Gibson confirmed that during his first few interactions with Parsons, Fuelco's decision whether to expand into Arizona had "not yet been made" and instead it was "sort of a desire of the company to expand its footprint, to diversify its customer base away from—not away from, but just in addition to the oil field . . . industry." (*Id.*) Gibson further testified that the projections he submitted to Maxwell assumed that Parsons, Henry, and Reinesch would join Fuelco. (*Id.* at 34.) However, Gibson testified that the names of Parsons, Henry, and Reinesch did not appear in the Business Case Documents. (*Id.* at 36 [Q: "Do you recall whether the names of Mr. Parsons, Mr. Henry, or Mr. Reinesch were on that document?" A: "No, I don't—I don't think their names were incorporated into the document."].)

Gibson was asked whether "at the time [Gibson] submitted the business case pro forma document . . . did [he] already have a commitment from Mr. Parsons, Mr. Henry, and Mr. Reinesch that they would be interested in joining Fuelco if Fuelco elected to expand into Phoenix." (*Id.* at 35.) Gibson responded:

> I believe I did. The . . . pro forma projections business case that I put together was kind of a living document. So it sort of, you know—it started as a discussion document between [Parsons] and I, and—and just sort of, you know, had a life of its own for three or four or five months, or—onto becoming projections of the company—at least for the southwest region.

(*Id.*)

Based on the Business Case Documents, Maxwell and Gibson concluded that Fuelco should expand into Arizona. (*Id.* at 36.) When further probed, Gibson recalled that

the Business Case Documents also contained "pro forma projections of about three years with . . . maybe a six-month period for 2018" so, in total, they included projections for "part of 2018, all of 2019, and all of 2020." (*Id.*)  Gibson indicated that the documents also included projections for Colorado.  (*Id.*)

This exchange followed:

Q:   Did they ever—did any of those three ever provide to you—prior to the time you submitted your pro forma to Mr. Maxwell, did any of those three provide you with any written documents that contained any sales data or financial data?

A:   Well, [Parsons] and I were working on the pro forma together.  So he and I were, you know—I think [Henry] may have had inputs to the pro formas also, from a volume or sales perspective—margin perspective.  But . . . it was more of an electronic document that we were—that was growing and, you know, that was the source of our projections.

Q:   Do you recall what kind of a document the pro forma was?

A:   It was an Excel—Excel worksheet.

Q:   Do you recall who—and I understand it was—different folks had input on the Excel spreadsheet. But do you recall who first created the spreadsheet?

A:   Who was what?

Q:   Who created the spreadsheet?

A:   No, I don't.

Q:   But the spreadsheet was shared with Mr. Parsons and Mr. Henry; correct?

A:   Yes.

Q:   And Mr. Parsons and Mr. Henry added information to the spreadsheet; is that correct?

A:   Yes.

Q:   And then, you of course added some information to the spreadsheet as well; is that right?

A:   I can't remember if I really did a lot of inputting to the spreadsheet.  I was more of a reviewer of the output.  I was more of an author of the narrative—the business case narrative.

Q:   Was the business case narrative part of the spreadsheet as well?

A:   No. It was a Word document.

Q:     So fair to say the business case that was documents submitted to Mr. Maxwell included at least two components?  One was a Word document that included the narrative, and then the other was the Excel spreadsheet that included the projections?

A:     Yes.

Q:     Was there any other components of that business case?

A:     No, I don't believe so.

(*Id.* at 37.)  During the deposition, Plaintiff's counsel asked defense counsel to produce the Business Case Documents.  (*Id.* at 35 ["SC Fuels is requesting from Counsel that that document be produced in the case.  I just wanted to get that on the record."].)

III.    Plaintiff's Follow-Up Efforts (Second Half Of 2021)

During the second half of 2021, Plaintiff's counsel emailed defense counsel five different times to inquire about the production of the Business Case Documents.  (Doc. 150 ¶ 6.)  The inquiries were sent on July 9, July 15, September 22, October 6, and October 18.  (*Id.*)

On November 5, 2021, defense counsel indicated that Defendants were still searching.  (*Id.*)

On December 10, 2021—which was after the formal close of discovery, per the deadlines in the scheduling order (Docs. 51, 141)—Plaintiff's counsel sent a formal letter to defense counsel again requesting the Business Case Documents.  (Doc. 150-5.)  Among other things, the letter generally recounted the timeline of requests and the nearly six months that had passed since the initial request.  (*Id.* at 2-3.)  Plaintiff's counsel requested production of the documents on or before December 17, 2021, or he would file a motion for spoliation sanctions.  (*Id.* at 3-4.)

On December 20, 2021, after receiving no response, Plaintiff's counsel sent a follow-up email to defense counsel.  (Doc. 150-6 at 2-3.)

On December 22, 2021, after again receiving no response, Plaintiff's counsel sent another follow-up email to defense counsel.  (*Id.* at 2.)

On December 29, 2021, after yet again receiving no response, Plaintiff's counsel sent yet another follow-up email to defense counsel.  (*Id.* at 1.)

On December 30, 2021, defense counsel responded: "as you've seen, I'm [out] of the office.  My client will produce the document referenced in Todd Gibson's Deposition as soon as possible." (*Id.* at 2.)

On January 4, 2022, defense counsel elaborated: "[W]e will produce the document referenced in Todd Gibson's deposition on or by Friday January 14th." (Doc. 150-6 at 6.) That same day, Plaintiff's counsel inquired why, if the document is merely an Excel spreadsheet, it could not be produced sooner. (*Id.* at 5.)  He requested that defense counsel confirm possession of the document, indicate whether the emails would also be attached, and indicate whether the narrative portion of the document had also been located. (*Id.*)

That same day, defense counsel replied as follows:

> [A]s I said, it will be produced by January 14th.  If it can be produced sooner, then it will be.  Your other questions relate to attorney client privileged communications and will not be addressed.  Any and all existing documents that are located and that are responsive to your discovery requests (and that you raise below) will be produced.

(*Id.*)

IV.   <u>The Disclosure Of The PowerPoint (January 2022)</u>

On January 14, 2022, defense counsel emailed Plaintiff's counsel a .pdf version of a PowerPoint presentation:

> [P]lease see the attached per my January 4th email.  This is the document that was raised during Todd Gibson's deposition and requested by you during his deposition (page 56).   There are no other items, documents or communications surrounding this document to produce or that are responsive to SC Fuels' discovery requests (that have not already been produced).

(Doc. 150-7 [email with enclosure: "Fuelco Energy Business Plan.pdf"].  *See also* Doc. 153-1 at 8-27 [actual .pdf of PowerPoint].)

A series of email exchanges between the two attorneys followed. (*See generally* Doc. 150-8.)  Additionally, around January 18 or 19, 2022, counsel had a phone call about the disclosure of the PowerPoint. (*See id.* [emails setting up a call and stating the call took place].)  Each side contests the purpose of and what was discussed during the call.  In his declaration, Plaintiff's counsel states that, during the call, defense counsel "refused to

confirm whether or not Parsons or Henry had been asked to search for the Business Case Documents but agreed that she would speak to them and get back to me."  (Doc. 150 ¶ 9.)

On January 20, 2022, Plaintiff's counsel sent an email expressing his understanding that defense counsel would confer with Henry and Parsons about their searches for the Excel spreadsheet and related communications and report those findings to him the next day and, in the event the spreadsheet was not located, discuss a "discovery conference." (Doc. 150-8 at 5.)

On January 21, 2022, defense counsel replied: "Your email does not accurately reflect our conversation."  (*Id.* at 4.)  In this email, defense counsel recalled a dispute over whether there was any "reason to believe that any such communications ever were made or existed to begin with."  (*Id.*)  Defense counsel further characterized Plaintiff's counsel's suggestion that "the spreadsheet was ever sent or received by Tom Parsons or Luke Henry" as a "false assumption" and "confirm[ed] that no emails or other communications were exchanged between Tom Parsons, Luke Henry and/or Todd Gibson regarding the spreadsheet or the content in the spreadsheet or attaching or including the spreadsheet that appears as the last page of the business overview.  Tom Parsons had no manual input into the spreadsheet, nor did Luke Henry."  (*Id.*)  She concluded: "There is nothing more to produce, nothing more exists or ever existed, regarding 'the excel spreadsheet and/or communications regarding it.'"  (*Id.* at 5.)

That same day, Plaintiff's counsel replied, "I appreciate the response by today and your confirmation that Parsons and Henry have searched for, but cannot locate any documents relating to the excel projections."  (*Id.* at 3.)  However, he disagreed about whether Gibson's testimony suggested that Parsons or Henry had manual input into the spreadsheet.  (*Id.*)  Plaintiff's counsel further indicated he would be moving forward with seeking a "discovery conference" with the Court.  (*Id.*)

Several email exchanges followed.  Generally, Plaintiff's counsel sought to move forward with either a motion for sanctions or a discovery dispute.  (*See* Doc. 150-9 [email exchange].)  Plaintiff's counsel also suggested forensic imaging of Henry's, Parsons's, and

Fuelco's email accounts and hard drives, specifically to search for the Business Case Documents.  (*Id.* at 2.)

V.     The First Sanctions Motion (February 2022)

On February 9, 2022, Plaintiff filed a motion for spoliation sanctions.  (Doc. 149.)  In general, Plaintiff argued that (1) the Business Case Documents were responsive to numerous discovery requests and should have, at any rate, been included in Defendants' disclosures pursuant to the Mandatory Initial Discovery Pilot Project ("MIDP"); (2) the PowerPoint could not be the Business Case Documents, both because the format is incorrect and because it was not created until April 2018, which is when Henry and Parsons began working for Fuelco; and (3) Defendants' failure to locate additional materials despite continued search efforts established that the Business Case Documents had been lost or destroyed.  (*Id.* at 11-13, 15.)

In response, Defendants argued that sanctions were unwarranted because they had produced the Business Case Documents in the form of the PowerPoint presentation.  (Doc. 153 at 6.)   Defendants also asserted that Gibson's description of the Business Case Documents during the deposition, *i.e.*, as comprising a Word document and an Excel document, was the product of a mistaken memory.  (*Id.* at 11 ["[T]he Business Case document was created in PowerPoint, rather than Word or Excel as Todd Gibson originally thought . . . ."].)  Defense counsel, Gibson, Parsons, and Henry each submitted a supporting declaration.  Defense counsel stated that the produced PowerPoint was indeed responsive to the MIDP requirements and had not been produced earlier because Gibson did not find it during his initial searches.  (Doc. 154-1 at 5 ¶ 23.)   Gibson avowed that his earlier description of the Business Case Documents was inaccurate and that the PowerPoint was the only responsive document.  (Doc. 153-1 at 2-3 ¶ 10 ["There has never been a *Word* document or *Excel* spreadsheet as part of the Business Case I prepared.  I created the narrative section and spreadsheet in the Business Case document using PowerPoint."].)  Gibson further contradicted his deposition testimony by stating that "[n]o other person besides me added content to the Business Case document that I created, nor was it

circulated to any other person by email for input." (*Id.* at 4 ¶ 13.)  Gibson also stated that the PowerPoint was never emailed to Maxwell and, instead, was only provided to Maxwell in hard-copy format. (*Id.* at 4 ¶¶ 14-15.)  Finally, Gibson avowed: "Fuelco personnel and I have performed multiple searches for documents and electronically stored information during the discovery phase of this lawsuit, and since, including hard drives, network drives, emails, inboxes, sent folders, archived and deleted folders." (*Id.* at 5 ¶ 17.)

Parsons provided a declaration, asserting that he "did not create [the PowerPoint] or any portion of it" or "input any content." (Doc. 153-4 ¶ 3.)  Regarding the spreadsheet on the last page of the PowerPoint, Parson averred: "I have not seen this spreadsheet or any version of it before being provided it to review in January 2022." (*Id.* ¶ 5.)  Parsons also stated that he believed that, sometime between March 2018 and January 2022, he was "shown a hard copy of the narrative section of the document by" Gibson but that he was "not given a copy of the document nor did [he] ever possess a copy of the document." (*Id.* ¶ 6.)  Parsons further avowed that he "preserved, retained and produced all documents and electronically stored information that could potentially be relevant to the allegations in this lawsuit during discovery." (*Id.* ¶ 8.)  However, Parsons did not make any avowals related to any searches he conducted personally. (*Id.*)

Henry's declaration was nearly identical to Parsons's. (Doc. 153-5.)

In reply, Plaintiff argued that the PowerPoint and Gibson's declaration were inconsistent based on the date of the produced presentation and Gibson's numerous recollections during his deposition. (Doc. 157 at 3.)

VI.   The Forensic Examination Order (May 2022)

On May 3, 2022, the Court held a hearing to address the spoliation motion. (Docs. 178, 187.)  Plaintiff's counsel argued that there were "inconsistencies between [Gibson's] clear testimony at [his] deposition and then ultimately how he changed that testimony in very material ways when he submitted the declaration in opposition to this motion." (Doc. 187 at 44.)  Plaintiff's counsel further argued that the still-unproduced Business Case Documents are a "smoking gun." (*Id.* at 46.)  Plaintiff's counsel elaborated that "the reason

why this is so important is that the other individual defendants had confidentiality agreements and other contractual obligations to my client during their employment. . . . To the extent that they were sharing customer information and communications with the competitor while they were employed, that's a violation of their restrictive covenants, it's a violation of the confidentiality agreements, to the extent they were sharing confidential information as defined in those agreements.  It's a breach of their duty of loyalty.  It's potentially misappropriation of trade secrets, depending on what information was shared." (*Id.* at 48-49.)   Plaintiff's counsel conceded, however, that Gibson's testimony alone establishes some of those points.  (*Id.* at 49.)

The Court questioned defense counsel about the seeming timeline discrepancy raised by Plaintiff's counsel.  (*Id.* at 53.)  Defense counsel responded that the document, per Gibson's deposition, "formed the basis for [Fuelco's] expansion, the decision to expand into the southwest region.  It was not the basis—and he did not testify that it was the basis for hiring Luke Henry or Tom Parsons." (*Id.* at 54.)  Plaintiff's counsel disagreed, arguing that "[t]he decision whether or not to expand was tied obviously to the decision to hire the individual defendants." (*Id.* at 57.)  Plaintiff's counsel further noted that April 2018 (*i.e.*, the date the PowerPoint was created) "is well after the decision [to expand] had been made." (*Id.*)

Ultimately, the Court denied without prejudice Plaintiff's request for an adverse inference sanction.  (*Id.* at 61.)  "[H]aving carefully reviewed everything that the parties filed and heard the argument today," the Court remained unconvinced that Plaintiff "has shown, at least yet, that anything was lost or destroyed." (*Id.*)  However, the Court acknowledged "we've got a difficult situation here where . . . the core claim is having to do with breaching these confidentiality agreements with a competitor while they're still employed." (*Id.* at 62-63.)  The Court also stated that it retained "some lingering doubts" about Defendants' explanation for the belated production of the PowerPoint, because Plaintiff had raised "certain reasons" from which "one could reasonably infer that the PowerPoint that has now been produced is not really the same thing that [Gibson] was

1   talking about during the deposition." (*Id.* at 62.)  Accordingly, the Court ordered a forensic

2   examination, with costs initially borne by Plaintiff.  (*Id.* at 63-65 ["If it turns out that the

3   forensic exam supports the position they've taken, maybe at a later point down the road we

4   could talk about shifting the costs on it."].)

5   VII.   Further Developments Regarding The Forensic Examination (Second Half Of 2022)

6          On July 25, 2022, the parties petitioned the Court for guidance as to the parameters

7   of the forensic examination.  (Doc. 185.)  The details of the parties' dispute reveal that

8   Defendants proposed that only "the hard drive of Todd Gibson" should be forensically

9   imaged, while Plaintiff requested examination of the "hard drives and emails of Parsons,

10  Henry, and Gibson."  (*Id.* at 3-4.  *See also* Doc. 195-2 [email exchange outlining the

11  discovery dispute, with Plaintiff's counsel asking: "[I]s there a reason why the hard drives

12  of Parsons and Henry would be off-limits?"].)

13         On July 26, 2022, the Court issued the following clarification: "On the one hand,

14  the Court agrees with Plaintiff's contention that the forensic examination need not be

15  limited to Gibson's hard drive.  Instead, it should include the email accounts and hard

16  drives of Parsons, Henry, and Gibson.  On the other hand, the Court disagrees with

17  Plaintiff's contention that the examination should go beyond a search for the Business Case

18  Documents themselves and include a search for 'any email correspondence between

19  Parsons, Henry, and Gibson, relating to the Business Case Documents.'"  (Doc. 186.)

20         The parties then agreed on an examination protocol to be conducted by a third-party

21  vendor ("Ankura").  (Doc. 189 ¶ 12; Doc. 192-1 at 9-14 [protocol].)

22         On October 21, 2022, defense counsel emailed Plaintiff's counsel to report that

23  "I've confirmed the hard drives [of Henry and Parsons] will not be produced.  They are not

24  available.  I will provide full background as to their unavailability and you can take

25  whatever steps, if any, you feel are necessary."  (Doc. 189-8 at 2.)

26         The same day, Plaintiff's counsel asked for an "explanation about the unavailability

27  of the hard drives."  (*Id.*)  The email also addressed whether Ankura would get access to

28  the "remaining emails."  (*Id.*)

On October 25, 2022, defense counsel sent another email stating that "Fuelco no longer has the hard drives in question." (Doc. 189-9 at 3.)  Defense counsel then outlined Fuelco's standard practice for a litigation hold, which included sending the hard drives to a third-party vendor, but confirmed "we have now verified that the hard drives did not go there.  We will produce an affidavit outlining the steps taken to preserve and the findings made as described herein." (*Id.*)  As for the email issue, defense counsel stated that she anticipated Ankura would get "access to the remaining 3 email accounts tomorrow." (*Id.*)

The same day, Plaintiff's counsel requested the affidavit be provided "by the end of the week" and listed several questions that he wanted addressed, including:

1. The dates Henry, Parsons, and Gibson turned over their computers containing the hard drives to Fuelco, and what Fuelco then did with them.

2. Whether Reinesch's hard drive has also been lost.

3. The name(s) of the individuals who last had possession of each of the 3 hard drives (4 hard drives if Reinesch's has been lost), and the date(s) they last had such possession.

4. The dates, if any, that any searches were run on the 3 (or 4) hard drives.

5. Whether and when the hard drives were searched in connection with producing documents responsive to SC Fuels' document requests and Fuelco's mandatory initial discovery obligations.

6. Whether and when the hard drives were searched to locate the Business Case Documents.

7. When Fuelco became aware that the hard drives had been lost or destroyed.

8. Why Fuelco did not bring this to Plaintiff's or the Court's attention sooner.

(*Id.* at 2.)

On October 26, 2022, defense counsel informed Plaintiff's counsel via email that "two of the email account credentials were provided last week to Ankura and the remaining three email account credentials were provided today." (Doc. 189-10 at 7.)  As for the hard drive issue, defense counsel reiterated: "you were informed last week that they have not

been located and the explanation was also provided to you on Monday.  Fuelco offered to provide an affidavit regarding the explanation and, again, that will be provided."  (*Id.*)

That same day, Plaintiff's counsel responded by asking both when the affidavit would be provided and whether it would "include the information I requested in the email I sent yesterday."  (*Id.* at 6.)  Plaintiff's counsel replied that same day: "Again, as stated, the affidavit will be provided once it is completed and it will provide the explanation as to the hard drives and why they are not able to be produced."  (*Id.*)  Later that day, Plaintiff's counsel again outlined his overarching frustrations about the search for the Business Case Documents.  (*Id.* at 4-5.)  He also indicated that he would be filing another motion for sanctions and requested that defense counsel provide a timeline for the affidavit along with whether she intended to answer his enumerated questions.  (*Id.*)

On October 28, 2022, defense counsel responded.  (*Id.* at 3.)  First, defense counsel characterized Plaintiff's counsel's email as "false and inflammatory" and asked him to "immediately discontinue your reckless accusations and threats."  (*Id.*)  As for the affidavit, defense counsel stated that it "has been offered and will be provided."  (*Id.*)  As for timing, defense counsel represented that she notified Plaintiff's counsel the same day she "received confirmation regarding the hard drives."  (*Id.*)  Defense counsel posited that the reason Plaintiff's counsel was so focused on the hard drives was due to a change in Ankura's search protocol.  (*Id.*)  More specifically, defense counsel stated that she "learned today that you blatantly authorized, or intentionally failed to restrict against, Ankura's wholesale forensic examination of Defendants' emails.  This is exactly what we warned against, given your repeated attempts to do so, and which the Court ordered against."  (*Id.*)  Defense counsel indicated that she planned to advise the Court of Plaintiff's counsel's conduct.  (*Id.*)

Later the same day, Plaintiff's counsel responded: "I will address only your contentions about the inspection protocol since you have not substantively addressed any of our concerns about the hard drive spoliation."  (*Id.* at 2.)  Plaintiff's counsel then accused defense counsel of manufacturing her concern about the forensic examination protocol to "distract from your client's discovery abuses" and maintained he has "no idea what issues

you are complaining about" and generally has "no reason to believe they are not following the protocol." (*Id.*)  In closing, Plaintiff's counsel offered to confer further on the Ankura issue if defense counsel provided additional information.  (*Id.*)

On November 8, 2022, defense counsel informed Plaintiff's counsel via email that Henry's hard drive had been located and it was possible that Parsons's hard drive would be located as well.  (Doc. 189-11 at 2.)  Defense counsel further represented that the "company responsible for retaining the laptops was acquired by another company, unknown to Fuelco, and in short it has been a very difficult process." (*Id.*)  Regarding email access, defense counsel surmised that any delay at this point was Ankura's fault, given that she has "provided all the necessary credentials." (*Id.*)  Additionally, defense counsel confirmed that Ankura went beyond the "limits of the protocol and even violated terms of the protocol" and stated that she was "alarmed by the failure to properly advise Ankura about the protocol and the limits of their searches." (*Id.*)

That same day, Plaintiff's counsel responded by inquiring about the status of Gibson's original hard drive and when Henry's hard drive would be produced.  (*Id.*)  At that time, defense counsel provided no further updates on the status of the hard drives. (Doc. 189 ¶ 18.)

VIII.   The Second Sanctions Motion (December 2022)

On December 7, 2022, Plaintiff filed the now pending motion, seeking (1) a default judgment against Defendants pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, the Court's inherent authority, and/or Rule 11; or (2) in the alternative, an adverse-inference instruction and an order reopening discovery.  (Doc. 188 at 16-17, 23-24.)

In response, Defendants submitted various pieces of evidence related to the results of the forensic examination.  One of those submissions is a declaration from defense counsel, the majority of which is devoted to the controversy over the forensic imaging protocol and whether she timely provided Ankura with access to Defendants' email accounts.  (*See, e.g.*, Doc. 192-1 at 1-5 ¶¶ 2-29.)

As for the hard drive issue, defense counsel stated that on October 21, 2022, "Defendants believed that the Fuelco issued laptops of Tom Parsons and Luke Henry were not available and that Todd Gibson had turned over his prior laptop and thus it was not available." (*Id.* at 5 ¶ 30.)  However, defense counsel clarified that on December 9, 2022, "it was confirmed to [her] that Todd Gibson's prior laptop used during the search period was 'swapped out' due to a virus and that a mirror image of the hard drive contents of the prior laptop was transferred to his current laptop.  Therefore, the hard drive for the search period was available and would be produced for search and examination." (*Id.* at 7 ¶ 36.)[2] Attached to defense counsel's declaration are copies of Ankura's search protocol (*id.* at 9-14), an overview document that Defendants refer to as a "narrative" (*id.* at 16-20), and Gibson's deposition (*id.* at 21-87).

Defense counsel also outlined the results of the forensic imaging process.  (*Id.* at 3 ¶ 16.)  She reported that three responsive Word documents and three responsive Excel workbooks were recovered and thereafter produced to Plaintiff.  (*Id.*)  The Word documents were "exact duplicates" of a Word document entitled "Overview of Commercial Southwest fuels and lubes business" ("Overview") that had previously been disclosed to Plaintiff. (Doc. 192-1 at 3-4 ¶¶ 16-20; Doc. 195-1 [original disclosure of email with attachment].) The Excel documents were "exact duplicates" of an Excel document entitled "FY'18 Commercial Budget" that had not been previously produced and did not appear to match the spreadsheet embedded in the PowerPoint.  (Doc. 192-1 at 4 ¶¶ 21-22.)  Finally, as for the forensic search of the "Defendants' email accounts," defense counsel avowed that Ankura "identified no deleted, erased, missing or altered emails or attachments to emails during its forensic review."  (*Id.* at 3 ¶ 15.)

Defendants also provided a declaration from Kevin Fung, who was responsible for Fuelco's "equipment inventory management processes including company-issued tablets and phones" and, in 2022, "was given formal responsibilities over company-issued

---

[2]      Defense counsel also described her email communications with Plaintiff's counsel (Doc. 192-1 at 6-7 ¶¶ 31-35), which are summarized earlier in this order.

laptops." (Doc. 192-2 ¶ 3.)  Fung avowed that he has "knowledge of the steps taken by Fuelco in this case with regard to retaining the computer hard drives of former and current employees." (*Id.* ¶ 4.)  Regarding litigation holds, Fung explained that Fuelco's general practice is to "preserve company-issued computers and hard drives of employees or former employees flagged as a result of an official 'Litigation Hold.'" (*Id.* ¶ 5.)  Between 2018-2020, Fung knew of one attorney (General Counsel) and one paralegal who were in charge of the litigation hold process.  (*Id.* ¶¶ 6-7.)  Fuelco's "standard practice" was that the paralegal "would prepare a Litigation Hold memo on litigation matters served on the company and either talk to the applicable General Counsel (private or public) personally or by phone as to internal personnel who should be copied on the Litigation Hold.  She would then circulate Fuelco's standard Litigation Hold memo to persons identified as copied on the memo." (*Id.* ¶ 7.)  Here, however, in place of a litigation hold memo, opposing counsel's July 2018 litigation hold letters were used.  (*Id.* ¶ 8; Doc. 55-16 [cease and desist letter to Henry]; Doc. 55-17 [cease and desist letter to Parsons]; Doc. 55-18 [cease and desist letter to Reinesch].)  Fung explained that, after a litigation hold is in place, Fuelco's usual practice is that "the computers and/or hard drives identified are forwarded to an outside third-party data discovery vendor.  During the relevant time period, the vendor that Fuelco and all other companies used was Xacta Data Discovery." (Doc. 192-2 ¶ 9.)

Fung also explained that Parsons and Henry were issued laptops while they were employed by Fuelco.  (*Id.* ¶ 11.)  Fuelco employed Parsons from April 2, 2018, through July 8, 2019, at which time Parsons returned his computer to the company.  (*Id.* ¶ 12.)  Fuelco employed Henry from April 9, 2018, through January 30, 2020, at which time Henry returned his computer to the company.  (*Id.* ¶ 13.)  For context, Fung explained that this litigation began in July 2018, with Defendants' initial disclosures "issued in October 2018" and the responses to discovery requests and subpoenas submitted in January 2019 (with supplemental responses occurring afterwards).  (*Id.* ¶ 10.)  It was Fung's understanding that after Parsons's departure in July 2019, "Fuelco intended for a legal hold to be placed on the computer he used, serial number 9T6FMH2." (*Id.* ¶ 15.)  Similarly,

after Henry's departure in January 2020, "a legal hold was believed to have been placed on the computer he used, serial number 8L6FMH2." (*Id.* ¶ 16.)

However, in the response brief, Defendants confirm that Parsons's and Henry's hard drives have been lost. (Doc. 192 at 12.) How this happened is somewhat unclear. According to Fung, after the Court ordered a forensic examination of the computers, "Fuelco reached out to Xacta to locate and access the laptops/hard drives of Tom Parsons and Luke Henry." (Doc. 192-2 ¶ 17.) "Fuelco received no response from Xacta for several weeks. Fuelco then reached out to the customer service representative from Xacta and learned that the company had been acquired by another company known as Consilio." (*Id.* ¶ 18.) Fung described a November 8, 2022 conference call with Consilio, during which "Consilio conducted an electronic inventory search and stated that the name 'Luke Henry' came up on the list. Consilio then began the process of locating and retrieving Luke Henry's computer and agreed to, at the same time, search for Tom Parsons' computer." (*Id.* ¶¶ 19-20.) However, in December 2022, "Consilio confirmed to Fuelco that it was unable to locate the laptop inventoried under Luke Henry's name" and was also unable to locate the laptop issued to Parsons. (*Id.* ¶ 21.) Fung explained that Fuelco's discovery responses "were based on searches of company computers, as well as any other databases or sources that may contain responsive or discoverable information." (*Id.* ¶ 22.)

Finally, as for Gibson's laptop, Fung stated that it became infected with a virus in October 2020. (*Id.* ¶ 23.) Per company policy, the laptop was "swapped" and the new laptop was functionally an identical copy of the original laptop. (*Id.* ¶¶ 23-27.) Although the original version is no longer available, the swapped version of the laptop was produced to Ankura. (*Id.* ¶¶ 28- 29, 31.) Defense counsel confirms that Ankura searched this version of Gibson's hard drive. (Doc. 192-1 at 4-5 ¶¶ 23-24.)

During the forensic search of Gibson's replacement laptop, Ankura identified 14 potentially responsive items, but none of them were "Word or Excel documents" and "Ankura identified no deleted, erased, missing or altered files, documents or data during its forensic search of Todd Gibson's hard drive." (*Id.* at 5 ¶¶ 24-26.)

- 18 -

IX.     Defendants' Supplemental Submissions (February 2023)

On February 22, 2023, after reviewing the parties' motion papers, the Court held a telephonic status conference.  (Doc. 199.)  The Court requested that Defendants file "a declaration from witnesses who are competent to testify attesting to the results of the forensic email search and providing the details regarding the searches that occurred with respect to the Henry and Parsons hard drives before they were lost."  (Docs. 199, 202.)

Those documents were timely filed.  (Docs. 200-2 [Ingold decl.], 200-3 [Parsons decl.], 204-2 [Henry decl.].)[3]  Defense counsel's supplemental declaration provides that, as of February 2023, Ankura was able to access Parsons's, Henry's, and Gibson's Fuelco email accounts.  (Doc. 200-2 ¶¶ 16-18.)  Per the search protocol, 13 emails were found that had Excel or Word document attachments during the relevant period, but "none of the 13 items were 'responsive.'"  (Id. ¶ 18.)  Ankura also "identified no deleted, erased, missing or altered emails or attachments to emails."  (Id. ¶ 19.)

Parsons's supplemental declaration confirms he had his laptop until July 8, 2019, when he was no longer employed by Fuelco.  (Doc. 200-3 ¶ 2.)  Parsons searched this computer in "September and October 2018 for use in providing responses under the [MIDP]; in December 2018 and January 2019 for use in providing responses to Plaintiff's requests for production; and between March and July 2019 as requested by counsel."  (Id. ¶ 6.)  Parsons avows that "[a]ll discoverable items that were located by me on my company laptop/hard drive as a result of these searches, if any, have been produced."  (Id. ¶ 7.)

Henry's supplemental declaration confirms he had his Fuelco-issued laptop until January 30, 2020.  (Doc. 204-2 ¶ 2.)  Henry "conducted multiple searches of my company laptop/hard drive as part of my discovery obligations.  My numerous searches for relevant, potentially relevant, and discoverable documents and information included, but were not limited to, my company laptop/hard drive."  (Id. ¶ 5.)  As for the timing of his searches, Henry searched "in September 2018 for use in providing responses under the [MIDP];" "in

---

[3]     Defense counsel's declaration was inadvertently filed twice.  (Docs. 200-1, 200-2.) Defendants corrected this error at Doc. 204.

December 2018 and January 2019 for use in providing responses to Plaintiff's requests for production;" "in July, August and September 2019 for use in providing responses to Plaintiff's discovery requests;" and "between December 2019 and January 2020 as requested by counsel." (*Id.* ¶ 6.) Henry concludes that "[a]ll discoverable items that were located by me on my company laptop/hard drive as a result of these searches have been produced." (*Id.* ¶ 7.)

## DISCUSSION

### I.  Legal Standard

"Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation.  Spoliation arises from the failure to preserve relevant evidence once a duty to preserve has been triggered." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334 (D. Ariz. 2022) (citation and internal quotation marks omitted).

When, as here, a party seeks sanctions based on the spoliation of one particular category of evidence, electronically stored information ("ESI"), the request is governed by Rule 37(e) of the Federal Rules of Civil Procedure.  Rule 37(e) was "completely rewritten" in 2015 to "provide[] a nationally uniform standard for when courts can give an adverse inference instruction, or impose equally or more severe sanctions, to remedy the loss of ESI." *See generally* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 37, at 1216 (2022).  The text of Rule 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1)    upon finding prejudice to another party from the loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>     (A)    presume that the lost information was unfavorable to the party;
>
>     (B)    instruct the jury that it may or must presume the

information was unfavorable to the party; or

(C)    dismiss the action or enter a default judgment.

(*Id.*)  A court cannot rely on its inherent authority (or state law) when deciding whether to impose the categories of sanctions authorized by Rule 37(e)—the standards supplied by Rule 37(e) are exclusive.  Gensler, *supra*, Rule 37, at 1221.  *See also Newberry v. Cnty. of San Bernardino*, 750 Fed. App'x 534, 537 (9th Cir. 2018) ("The parties framed the sanctions issue as invoking the district court's inherent authority.  However, at the time the sanctions motion was filed, sanctions were governed by the current version of Rule 37(e) . . . [which] therefore foreclose[d] reliance on inherent authority to determine whether terminating sanctions were appropriate.") (citations and internal quotation marks omitted).

A party seeking sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed.  Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment ("The new rule applies only . . . when [ESI] is lost.").  If such a showing has been made, Rule 37(e) "establishes three prerequisites to sanctions: the ESI should have been preserved in the anticipation or conduct of litigation, it is lost through a failure to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."  *Fast*, 340 F.R.D. at 335.  "If these requirements are satisfied, the rule authorizes two levels of sanctions.  Section (e)(1) permits a court, upon finding prejudice to another party from the loss of ESI, to order measures no greater than necessary to cure the prejudice.  Section (e)(2) permits a court to impose more severe sanctions such as adverse inference jury instructions or dismissal, but only if it finds that the spoliating party 'acted with the intent to deprive another party of the information's use in the litigation.'"  *Id.*  However, "[f]inding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2).  The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."  Fed. R. Civ. P. 37(e), advisory committee's note to 2015

amendment.

"[T]he relevant standard of proof for spoliation sanctions is a preponderance of the evidence." *Fast*, 340 F.R.D. at 335.  *See also Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052-53 (S.D. Cal. 2015) (same); *Singleton v. Kernan*, 2018 WL 5761688, *2 (S.D. Cal. 2018) (same).  The Court is the appropriate finder of fact on a Rule 37(e) motion.  *Mannion v. Ameri-Can Freight Sys. Inc.*, 2020 WL 417492, *4 (D. Ariz. 2020).  *See also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 (9th Cir. 1990) ("The imposition of discovery sanctions pursuant to [Rule 37] is reviewed for abuse of discretion.  Absent a definite and firm conviction that the district court made a clear error in judgment, this court will not overturn a Rule 37 sanction.  Findings of fact related to a motion for discovery sanctions are reviewed under the clearly erroneous standard.  If the district court fails to make factual findings, the decision on a motion for sanctions is reviewed de novo.") (citations omitted).

II.     The Parties' Arguments

Plaintiff argues that a default judgment sanction is warranted based on Defendants' intentional spoliation of ESI, withholding of evidence, and false and misleading statements regarding the same.  (Doc. 188 at 9.)  Plaintiff contends that Defendants could not have actually searched the hard drives for the Business Case Documents because Gibson's was not the original hard drive and Henry's and Parsons's have been lost.  (*Id.*)  Plaintiff also accuses Defendants of hiding the hard drive destruction issue since at least Gibson's deposition in June 2021.  (*Id.* at 8.)  Between the deception and spoliation, Plaintiff questions the diligence and accuracy of Defendants' initial discovery responses.  (*Id.* at 9.)  All told, Plaintiff argues that Defendants have "compromised the integrity of the legal proceedings."  (*Id.*)  In the alternative, Plaintiff seeks an adverse-inference instruction as well as the re-opening of discovery for "an opportunity to probe Defendants' prior discovery and seek discovery of Defendants' emails and hard drives anew through a court-supervised process in which that ESI is examined by experts for responsive documents."  (*Id.* at 23.)  Of primary concern to Plaintiffs is Defendants' refusal to "answer basic

question[s] about which hard drives were lost, when they were lost, and when and whether they were searched for the Business Case Documents and documents responsive to requests for production and MDIP [sic] requests." (*Id.*)

In response, Defendants argue: "There is unequivocally no basis for seeking, much less imposing, default judgment against Defendants as there has been no loss or destruction of any discoverable information or evidence in this case, nor has there been any misleading or false representation made to this Court by any Defendant or counsel." (Doc. 192 at 1.) Defendants argue that the premise of Plaintiff's spoliation theory concerning the Business Case Documents—*i.e.*, "that the PowerPoint document was not the same as the Word and Excel documents and, thus, they must have been destroyed"—has now been conclusively disproved by the forensic examination, which "produced no such 'other' documents, nor did it reveal any deleted or erased files." (*Id.* at 11-12.) In Defendants' view, there can be no sanctionable conduct where "the forensic searches confirmed that no documents were destroyed, deleted or removed from Defendants' email accounts or hard drive that were searched." (*Id.* at 2.) Defendants also argue that, to the extent Plaintiff seeks to rely on the Court's inherent authority as the basis for the sanctions request, this reliance is misplaced because Rule 37(e) supplies the exclusive standards for imposing a default-judgment sanction. (*Id.* at 15-16.) Defendants acknowledge that Henry's and Parsons's hard drives were "not available for Plaintiff's forensic search" but maintain that sanctions are not warranted based on the loss of those hard drives because they took reasonable steps to preserve the hard drives and because the hard drives were "searched for relevant and discoverable materials" after the litigation began. (*Id.*)

In reply, Plaintiff contends that "Defendants do not even attempt to explain or even address their numerous misrepresentations." (Doc. 194 at 4.) Plaintiff further notes that, during the forensic examination, a Word document was found attached to at least three emails, yet those corresponding emails were never disclosed. (*Id.*)[4] Overall, Plaintiff

---

[4]     Specifically, the Overview document was attached to at least three additional emails between Henry, Parsons, and Gibson that were not disclosed. (Doc. 194 at 4.)

accuses Defendants of hiding the ball and reiterates its request for a default judgment.  (*Id.* at 5.)  Plaintiff takes particular umbrage with Defendants' representation that the email addresses and Gibson's hard drive were searched, given that the only email accounts Ankura accessed were Parsons' and Henry's *personal* email accounts.  (*Id.* at 6; Doc. 195 ¶ 6.)  Plaintiff encourages the Court to infer widespread non-responsiveness given that "[r]esponsive documents are likely to reside in the unsearched locations."  (*Id.* at 6-7 [describing the Ankura search results and corresponding 31 emails, only six of which contained the attachments].)  Plaintiff also takes issue with the late disclosure of the PowerPoint, which was a "key, responsive document."  (*Id.* at 7.)  Finally, Plaintiff identifies at least seven supplemental disclosures that post-date Parsons's departure from Fuelco in July 2019 yet omit the unavailability of his hard drive and outlines the timeline of Defendants' allegedly misleading statements to the Court as to their search for the Business Case Documents.  (*Id.* at 8-12.)  In conclusion, Plaintiff reiterates: "We know that Defendants initially withheld the 2018 PowerPoint and are currently withholding dozens of key emails between Gibson, Parsons, and Henry.  Those are among the most critical documents in the entire case!  Plaintiff did not have the benefit of those documents during depositions.  The emails were only found via a very limited and incomplete forensic examination that Plaintiff was forced to spend tens of thousands of dollars in fees and costs to obtain."  (*Id.* at 13.)[5]

III.   Analysis

As an initial matter, Plaintiff variously invokes Rule 37(e), the Court's inherent authority, and Federal Rule of Civil Procedure 11 as the bases for its sanctions request.  (Doc. 188 at 9-10, 16 ["For the same reasons that a default sanction should be entered under the court's inherent authority, it can and should also be entered as a sanction under Rule 37(e)."].)  This approach is misplaced, at least in relation to Plaintiff's requests for a default sanction or an adverse inference based on the spoliation of ESI.  When a litigant seeks the

---

[5]   Plaintiff also contends that "Defendants failed to respond to Ankura's December 30, 2022, email again requesting access" to the Fuelco corporate email accounts for Henry, Parsons, and Gibson.  (Doc. 194 at 14.)

1   imposition of sanctions based on the spoliation of ESI and seeks the types of sanctions

2   authorized by Rule 37(e), that rule supplies the exclusive source of authority. *Newberry*,

3   750 Fed. App'x at 537.[6]

4   During oral argument, Plaintiff argued that the Court should look beyond Rule 37(e)

5   because the request for terminating sanctions is based, in part, on Defendants' false

6   statements and coverup attempts since the ESI spoliation occurred. When asked to identify

7   "the most egregious" misconduct that might give rise to such sanctions, Plaintiff pointed

8   to various statements in Gibson's February 2022 declaration (Doc. 153-1), which

9   Defendants submitted in response to the first sanctions motion.

10   The Court declines to rely on its inherent authority to impose additional sanctions

11   beyond the Rule 37(e) sanctions discussed elsewhere in this order. Even if, as Plaintiff

12   argues, such sanctions are potentially available based on litigation misconduct that is

13   related to (but distinct from) the challenged acts of spoliation,[7] the imposition of additional

14   sanctions is unwarranted here for two related reasons. First, the Court is not persuaded that

15   the challenged statements in Gibson's February 2022 declaration are as egregious as

16   Plaintiff suggests. In some cases, Plaintiff's theory of falsity turns on unresolved semantic

17   and definitional disputes, such as what constitutes the "Business Case Documents." In

---

18   [6]   Additionally, and as Defendants correctly note, "when citing Rule 37(e) in support

19   of its request for sanctions . . . Plaintiff at no time specifies whether its motion is brought
     under sections 37(e)(1) or 37(e)(2)." (Doc. 192 at 16 n.3.) Despite this imprecision, the

20   Court construes Plaintiff's motion as seeking relief under both provisions—although the
     main request is for a terminating sanction and one of the fallback requests is for an adverse-

21   inference instruction, which are two of the severe sanctions authorized under subdivision
     (e)(2), Plaintiff also makes a fallback request for the reopening of discovery, which could

22   be viewed as a "measure[] no greater than necessary to cure the prejudice" under
     subdivision (e)(1).

23   [7]   *See, e.g.*, *Jones v. Life Care Centers of Am., Inc.*, 2022 WL 4389727, *34 (M.D.

24   Fla. 2022) ("Use of inherent authority instead of rule-based or statutory authority to
     [impose terminating sanctions against] Ms. Jones is appropriate because neither the rules

25   nor the statute are up to the task. Rule 11 is geared toward perjury and more toward
     factual allegations or assertions lacking support for which curing through withdrawal after

26   warning is appropriate. Rules 16(f), 26(g), and 37(e) address timing and discovery
     violations. Although Ms. Jones's affidavit and testimony related to a discovery violation,

27   her perjury constitutes an independent, non-discovery affront to the judicial process.")
     (citations and internal quotation marks omitted); *Williams v. Am. College of Educ., Inc.*,

28   2019 WL 4412801, *10 (N.D. Ill. 2019) ("The inherent power should be used sparingly, to
     punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the
     litigation and (2) not adequately dealt with by other rules.") (cleaned up).

1   other cases, although certain representations have turned out to be false, Gibson may have
2   honestly believed in their truthfulness at the time he made them.[8]  This is not the sort of
3   litigation conduct that could properly give rise to terminating sanctions under the Court's
4   inherent authority.  *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021)
5   ("Because of their very potency, inherent powers must be exercised with restraint and
6   discretion.") (citation omitted).  Second, the Rule 37(e) sanctions being imposed here are,
7   in the Court's estimation, carefully calibrated to remedy all of the prejudice to Plaintiff
8   arising from Defendants' challenged conduct.  For example, as discussed *infra*, the Court
9   is now awarding Plaintiff all of the reasonable costs and fees arising from both sanctions
10  motions, as well as the costs associated with the forensic examination.  Thus, to the extent
11  Defendants' challenged litigation conduct (separate from the challenged acts of spoliation)
12  complicated and delayed the process of getting to the bottom of the spoliation issues, that
13  conduct has been fully addressed through the Rule 37(e) sanctions.  Thus, there is no need
14  to supplement the Rule 37(e) sanctions with additional inherent-authority sanctions.
15  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in
16  the course of litigation that could be adequately sanctioned under the Rules, the court
17  ordinarily should rely on the Rules rather than the inherent power.  But if in the informed
18  discretion of the court, neither the statute nor the Rules are up to the task, the court may
19  safely rely on its inherent power.").

20      With those considerations in mind, the Court turns to the relevant considerations
21  under Rule 37(e).

22      A.    **Whether ESI Was Lost**

23      "A party seeking sanctions under Rule 37(e) has a threshold duty to show that the
24  ESI at issue was, in fact, lost or destroyed."  *Cramton v. Grabbagreen Franchising LLC*,

---

26  [8]    For example, Plaintiff correctly notes that paragraph 18 of Gibson's February 2022
27  declaration ("Fuelco has produced everything that was located that relates to the issues in
    this case or is responsive to discovery requests served by Plaintiff.") is false, because the
    forensic examination that the Court ordered after Gibson submitted his declaration revealed
28  the existence of some additional, previously undisclosed documents.  But this development
    does not show that Gibson knew his statement was false at the time he made it.

2019 WL 7048773, *8 (D. Ariz. 2019).

Plaintiff's motion is best construed as arguing that three discrete sets of ESI have been lost: (1) the Business Case Documents, (2) Gibson's hard drive; and (3) Parsons's and Henry's hard drives.  (Doc. 188 at 17-18, 21-22.)  The Court will discuss each in turn.

### 1.   Business Case Documents

Whether the Business Case Documents were lost turns on whether the PowerPoint that Defendants belatedly produced in January 2022 is the same document that Gibson described during Fuelco's Rule 30(b)(6) deposition as the combination of a Word document and an Excel document.

On the one hand, the Court remains skeptical of Defendants' contention that Gibson simply made a mistake when describing the Business Case Documents during the deposition.  This skepticism is based on three considerations.

First, Gibson's description of the Business Case Documents during the deposition was not some offhand, passing remark.  The relevant questioning occupies several transcript pages and Gibson offered a very specific and seeming unequivocal recollection of how the Business Case Documents came into existence.  He specifically recalled that they comprised both a Word document and a separate Excel document and specifically recalled that Parsons and Henry were responsible for inputting data into the Excel document, which he then reviewed.  (Doc. 192-1 at 37.)  However, eight months later—and after the seeming significance of his testimony resulted in a sanctions motion—Gibson claimed in a declaration that, actually, there were never any Word and Excel documents and, actually, Parsons and Henry never had any role in inputting the data into the spreadsheet that was embedded within the PowerPoint.  (Doc. 153-1 ¶¶ 10-14.)  This about-face is, frankly, hard to believe.

Second, Defendants still have not adequately addressed the timing issue.  Gibson testified during the deposition that after Maxwell expressed an interest in "late 2017 or early 2018" about expanding into Arizona, he began speaking to Parsons (who was, at the time, still employed by Plaintiff).  (Doc. 192-1 at 30-32.)  Gibson further testified that these

conversations with Parsons began in "January or February of 2018" and that he spoke with Parsons at least five times before submitting the Business Case Documents to Maxwell. (*Id.*)   Critically, Gibson testified that the purpose of submitting the Business Case Documents to Maxwell was to decide *whether* Fuelco should expand into Arizona.  (*Id.* at 36 [agreeing that "during that meeting, you and Mr. Maxwell both agree[d] that it made sense to move forward" and that this agreement "was primarily based on the pro forma document that you prepared"].)   In a related vein, Gibson testified that the names of Parsons, Henry, and Reinesch did not appear in the documents.  (*Id.* at 36 [Q: "Do you recall whether the names of Mr. Parsons, Mr. Henry, or Mr. Reinesch were on that document?" A: "No, I don't—I don't think their names were incorporated into the document."].)   The difficulty with these assertions is that they are inconsistent with the PowerPoint that Defendants now claim is the document that Gibson was describing during the deposition.  The PowerPoint is dated "April 2018" (Doc. 153-1 at 8), identifies Arizona as one of the states where Fuelco had an "Active Footprint" (*id.* at 11), identifies Parsons, Henry, and Reinesch by name in Fuelco's organizational chart (*id.* at 13), and elsewhere identifies Parsons and Henry as "key management" employees who had already been hired (*id.* at 23-24).  The seeming inescapable conclusion from all of this is that the PowerPoint is a document that was created after the decision to expand into Arizona—and hire Parsons,[9] Henry, and Reinesch in support of the expansion effort—had already been made, which is far different from the Business Case Documents that Gibson described during the deposition (which were intended to evaluate whether to expand into Arizona).

Third, and more broadly, the Court finds it particularly appropriate to adopt a "trust, but verify" approach when evaluating Defendants' contentions regarding the Business Case Documents in light of Defendants' approach to other discovery issues in this case.

On the other hand, the results of the forensic examination, although not dispositive,

---

[9]   Fuelco made the job offer to Parsons on March 21, 2018.  (Doc. 192-1 at 55.)  This further undermines the suggestion that the "April 2018" PowerPoint is the same document that Gibson described during his deposition as being used to decide whether to expand into Arizona (and hire Parsons as part of the expansion effort).

tend to support Defendants' contention that Gibson made a mistake when testifying that the Business Case Documents comprised both a Word document and an Excel document. If that testimony were correct, one would have expected such documents to be found during the forensic examination of Gibson's hard drive.  But no such documents were found.  As Defendants correctly note, this suggests that the documents never "existed" in an alternative format.  (Doc. 192 at 17.)

The Court acknowledges that, with the loss of Henry's and Parsons's hard drives, this conclusion is not airtight.  However, the forensic search of Henry's and Parsons's personal email accounts also did not reveal any Word or Excel documents that matched the Business Case Documents description.  (Doc. 191-2 at 3-4 ¶¶ 15-18, 21-22; Doc. 200-2 ¶ 19.)  The search of Gibson's email account likewise came up empty for any such documents.  (*Id.*)

This backdrop creates a frustrating record.  Both sides have pointed to certain evidence that tends to support their position while failing to make any real effort to harmonize their position with the other side's evidence.  At any rate, because the Court is required (for purposes of resolving Plaintiff's motion) to make a factual determination about whether the Business Case Documents were lost, it will offer its best attempt to provide an explanation that harmonizes all of the evidence.  That explanation is that although Gibson may have misremembered, during the deposition, the *format* of the documents he used to create the business-case presentation to Maxwell (which would explain why no responsive Word or Excel documents were found during the forensic search), he did not misremember the *timing*—he created a PowerPoint at some point in February or March 2018 that made the case for expanding into Arizona, Maxwell found this presentation persuasive, and Fuelco thereafter decided to expand into Arizona and hired the individual Defendants as part of that expansion.  Where is this version of the PowerPoint?  One possible explanation is that it no longer exists because Gibson subsequently created new versions of it, with updated information, after Parsons and Henry were hired.  This would explain why the version that Defendants eventually produced is

dated "April 2018" and identifies Parsons and Henry as current employees. This explanation is also consistent with Gibson's testimony during the deposition that the pro forma was a "living document" that was changed and updated over time. (Doc. 192-1 at 35 ["[T]he pro forma projections business case that I put together was kind of a living document. So it sort of, you know—it started as a discussion document between Tom [Parsons] and I, and—and just sort of, you know, had a life of its own for three or four or five months, or—onto becoming projections of the company—at least for the southwest region. . . . I'm sure I have a version of it."]; *id.* [agreeing that "that document is a living document . . . [that] changed as time went on and as [Gibson] obtained additional information"].) Finally, this explanation is also consistent with Gibson's testimony during the deposition that Parsons and Henry were responsible for inputting some of the data into the spreadsheet portion of the document (*id.* at 37)—although they may not have inputted the data that appeared in the original version, given that they did not even work for Fuelco at the time, they could have begun inputting data into subsequent versions of the document after they joined.

This explanation, to be clear, may not be correct—it simply represents the Court's best attempt to harmonize all of the evidence that has been proffered to date. The best way to test this explanation would be to perform a forensic examination of the PowerPoint itself. Presumably, the metadata associated with the document will reveal when it was created and subsequently edited.

Given that discovery must be reopened regardless of the resolution of this issue (for the reasons discussed in later portions of this order), the Court declines at this time to make a final decision as to whether the Business Case Documents were lost. Instead, the parties may renew their arguments on this topic, if necessary, after the reopened discovery process is completed.[10]

---

[10]     The Court also notes that, if it were confirmed that Gibson initially created the pro forma in February/March 2018 as a PowerPoint but then created subsequent versions of the document (thereby rendering unavailable the original version), this could affect the resulting sanctions analysis under Rule 37(e)—for example, the analysis might turn on when, exactly, the original version was altered and whether Defendants had a duty to preserve on that date. The Court expresses no prejudgment on such issues and simply

2. <u>Gibson's Hard Drive</u>

Plaintiff argues that it is "undisputed that Fuelco spoliated Gibson's hard drive." (Doc. 188 at 22.)   This is inaccurate.   Fung submitted a declaration attesting to the procedure for performing a "swap" for a contaminated computer. (Doc. 192-2 ¶¶ 23-27.) He explained that "all existing and historical data" was transferred onto Gibson's new laptop, such that it is a functional equivalent of the old laptop. (*Id.* ¶¶ 26-27.)   Further, Ankura, which performed the forensic examination of the hard drive, did not find any evidence of tampering. (Doc. 192-1 at 5 ¶ 26 ["Ankura identified no deleted, erased, missing or altered files, documents or data during its forensic search of Todd Gibson's hard drive."].)   Given the common-sense need for a company to be able to maintain continuity of operations when a laptop becomes infected with a virus, Plaintiff's arguments for spoliation in relation to Gibson's hard drive are unpersuasive.

In any event, even assuming the 2018 hard drive was spoliated, the virus in that computer was a circumstance outside Defendants' control. Fed. R. Civ. P. 37(e), advisory committee note to 2015 amendment ("[T]he rule . . . is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve.   For example, . . . information the party has preserved may be destroyed by events outside the party's control—the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on.").   Therefore, Plaintiff has not made the necessary showing under Rule 37(e) to obtain sanctions based on the purported loss of Gibson's hard drive.[11]

3. <u>Parsons's And Henry's Hard Drives</u>

It is beyond reasonable dispute that Parsons's and Henry's hard drives have been lost.   Defendants acknowledge that although there was some initial hope the hard drives

---

identifies them as another reason why it makes sense to hold off any definitive resolution of the sanctions request based on the Business Case Documents.

[11]    Additionally, even if the Court found that Gibson's original hard drive was spoliated, it can be (and has been) replaced, which provides another reason why sanctions are unavailable under Rule 37(e).   *Fast*, 340 F.R.D. at 355 (one of the "prerequisites to sanctions" under Rule 37(e) is that the lost ESI "cannot be restored or replaced through additional discovery").

could be recovered from Consilio, they ultimately could not be located and are thus lost. (Doc. 192 at 12.)  Defendants' argument that Gibson's hard drive is a functional equivalent is unavailing.  Parsons and Henry are individual Defendants in this case who are accused of, *inter alia*, appropriating confidential and trade secret information from a former employer.  Parsons's and Henry's supplemental declarations establish that Fuelco was last in possession of their hard drives on July 8, 2019, and January 30, 2020, respectively.  (Doc. 200-3 ¶ 2; Doc. 204-2 ¶ 2.)  Therefore, the Court finds by a preponderance of the evidence that Henry's and Parsons's hard drives are lost.  Defendants offer no additional evidence as to when Fuelco was last in possession of the hard drives, despite the numerous opportunities to do so, so the Court finds that the hard drives were lost as of the dates Parsons and Henry returned them to Fuelco.  Thus, only as to Parsons's and Henry's hard drives, the Court turns to the next steps in the analysis under Rule 37(e).

B. **Duty To Preserve**

1. Reasonable Foreseeability Of Litigation

As the Ninth Circuit has explained, parties "engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citation omitted).  "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701, *14 (N.D. Cal. 2018) (internal quotation marks omitted).  The reasonable foreseeability of litigation "is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation.  This standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation.  However, it is not so inflexible as to require that litigation be 'imminent, or probable without significant contingencies.'" *Id.* at *15 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).

There can be no reasonable dispute that Defendants were on notice of the duty to preserve the hard drives of Henry and Parsons.  Each individual Defendant was sent a cease-and-desist letter that stated "you are required, under the law, to preserve, maintain, and not destroy or discard any information that pertains to the allegations made in this letter, including any electronically or digitally stored information that may exist on . . . laptops, computer hard drives, . . . or e-mail accounts." (Docs. 55-16, 55-17.)  *Cf. Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) ("It is clear that defendant had a duty to preserve relevant evidence that arose no later than June 26, 2006, when plaintiff's counsel sent the letter to defendant requesting the preservation of relevant evidence, including electronic documents. At that time, although litigation had not yet begun, defendant reasonably should have known that the evidence described in the letter may be relevant to anticipated litigation.") (internal quotation marks omitted).  Also, Fuelco was under an independent obligation to preserve the hard drives.  *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *7 (C.D. Cal. 2020), *report and recommendation adopted*, 2020 WL 1491339 (C.D. 2020) ("An entity and employee defendants can both be under a duty to preserve, and therefore culpable for spoliation of ESI, even if one or the other is directly responsible for the destruction of evidence.").  Fuelco was indisputably on notice of the need to preserve Henry's and Parsons's laptops at the time of their respective departures, which occurred while this case was pending.

### 2.   Reasonable Foreseeability Of Relevance

"A party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant." *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

Plaintiff's briefing highlights the importance of the hard drives.  First, the fact that the hard drives were lost casts some doubt on the adequacy of Defendants' discovery responses.  (Doc. 188 at 9.)  Second, despite the saga of searching for the Business Case Documents after Gibson revealed their existence during Fuelco's Rule 30(b)(6) deposition in June 2021, it is clear that Henry's and Parsons's hard drives were not searched as part

of that effort (as the hard drives were lost long before then).  Given that Defendants have admitted to searching the hard drives for responsive documents earlier in the litigation (Doc. 192 at 17), it follows that it was reasonably foreseeable that the hard drives would contain relevant information.

### C.   **Reasonable Steps to Preserve**

The Court must next determine whether the ESI was lost "through a failure to take reasonable steps to preserve it."  *Fast*, 340 F.R.D. at 355.  Defendants argue they took reasonable steps to safeguard the hard drives from destruction by putting them under a litigation hold, which ultimately resulted in the computers being in the possession of Consilio (formerly Xacta).  (Doc. 192 at 9-10, 17.)

Defendants' evidence on these points is unpersuasive.  Instead of avowing to events that *took place*, Fung's declaration equivocates on what Fuelco "intended" to be done or what the company "believed" was done with the hard drives at the time of Parsons's and Henry's departures.  (*See, e.g.*, Doc. 192-2 at ¶ 15 ["Following Tom Parsons' departure on July 8, 2019, Fuelco intended for a legal hold to be placed on the computer he used, serial number 9T6FMH2."]; *id.* ¶ 16 ["Following Luke Henry's departure on January 30, 2020, a legal hold was believed to have been placed on the computer he used, serial number 8L6FMH2."].)  This testimony raises more questions than it answers as to what, in fact, occurred.

The Court acknowledges there is some evidence supporting an inference that Fuelco put a litigation hold on Henry's laptop.  Fung testified that on a November 8, 2022 conference call, "Consilio conducted an electronic inventory search and stated that the name 'Luke Henry' came up on the list," but ultimately, the computer could not be located.  (Doc. 192-2 ¶¶ 20-21.)  This evidence, however, does not persuade the Court that reasonable efforts were made to preserve Parsons's and Henry's computers.  Standing alone, Fung's acknowledgment that the general procedure Fuelco intended to have in place was not followed suggests that reasonable steps were not taken.[12]  Neither Fung nor defense

---

[12]   Additionally, Fung's testimony that the 2018 cease and desist letters were used "in place of the standard company Litigation Hold memo" does not seem based on Fung's

counsel could identify the last date the laptops were in Fuelco's possession aside from when Henry and Parsons left the company. (*See* Doc. 192-2 ¶ 12 ["[Parsons] was issued a company laptop upon hiring and it was turned back in to Fuelco upon his termination."]; *id.* ¶ 13 ["[Henry] was issued a company laptop upon hiring and it was turned back in to Fuelco upon his termination."]; Doc. 192-1 at 6 ¶ 31 ["We will produce an affidavit outlining the steps taken to preserve and the findings made as described herein."].) Moreover, Defendants did not provide any evidence communicating that a litigation hold memo was sent or "copied" to anyone. (Doc. 192-2 ¶ 7 ["[T]he standard practice for all companies was that Ms. Colvard would prepare a Litigation Hold memo on litigation matters served on the company . . . . She would then circulate Fuelco's standard Litigation Hold memo to persons identified as copied on the memo."].)

Some of Defendants' contentions during oral argument, although perhaps helpful to the defense on other issues, underscore the unreasonableness of Defendants' preservation efforts related to the Parsons and Henry hard drives. In the tentative order issued before oral argument, the Court expressed concern that Defendants' conduct in the months following the May 2022 hearing on Plaintiff's first sanctions motion—during which Defendants sought to persuade Plaintiff, and then the Court, not to include the Parsons and Henry hard drives in the forensic examination—was intended to conceal the fact that the hard drives had been lost. During oral argument, defense counsel argued that this inference was unwarranted because "[a]t no time before October of 2022 did . . . counsel for the Defendants know that the laptops had not . . . been retained as we believed that they had." But assuming this is true, it means that Defendants did not bother to look for the Parsons and Henry hard drives, let alone confirm with the outside vendors that the hard drives were being preserved, during the six-month period between June 2021 and January 2022 in which Defendants were belatedly searching for the Business Case Documents, then again failed to look for the Parsons and Henry hard drives (let alone ensure their continued

---

personal knowledge of what occurred, given that he also testified that Fuelco's general counsel and paralegal handled litigation holds. (Doc. 192-2 ¶¶ 7-8.)

preservation) after Plaintiff filed the first sanctions motion in February 2022 that specifically requested the forensic examination of the Parsons and Henry hard drives as a remedy. (Doc. 149 at 2 ["Plaintiff seeks an order that the Spoliation Defendants submit to an independent forensic examination of the applicable email addresses and hard drives of Henry and Parsons . . . ."].) Instead, by Defendants' account, it was only in October 2022—more than a year after the controversy over the Business Case Documents erupted, and months after they asked the Court not to include that Parsons and Henry hard drives in the forensic examination—that Defendants got around to checking whether the hard drives were being preserved by the outside vendors. This underscores the unreasonableness of the preservation effort. Perhaps earlier efforts to look for the hard drives would have been successful.

Thus, the Court finds by a preponderance of the evidence that Defendants did not take reasonable steps to preserve the lost ESI.

### D. **Replaceability**

The next question under Rule 37(e) is whether the lost discovery "can be restored or replaced through additional discovery." Here, Henry's and Parsons's hard drives cannot be replaced through additional discovery because they are lost. Defendants have confirmed they have not been found despite months of searching.

### E. **Prejudice**

Plaintiff's briefing appears to seek sanctions under Rule 37(e)(2) by referencing a default judgment and an adverse inference, both of which are specifically enumerated as remedies under subdivision (e)(2). (Doc. 188 at 22-23.) Defendants argue that Plaintiff cannot show prejudice under Rule 37(e)(1) but acknowledge that it is unclear which provision of Rule 37(e) Plaintiff seeks to invoke. (Doc. 192 at 16-17; *id.* at 16 n.3.) Plaintiff makes no clarification in reply.

Subdivision (e)(2), unlike (e)(1), does not require an independent showing of prejudice to another party from loss of the information. Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment ("This is because the finding of intent [under (e)(2)]

1  can support not only an inference that the lost information was unfavorable to the party

2  that intentionally destroyed it, but also an inference that the opposing party was prejudiced

3  by the loss of information that would have favored its position.").  Thus, for Plaintiff's

4  request for sanctions under subdivision (e)(2), a showing of prejudice is unnecessary.

5       However, given the Court's interpretation that Plaintiff is, in the alternative, seeking

6  sanctions under subdivision (e)(1), a showing of prejudice is required in relation to those

7  alternative requests.  "The prejudice inquiry 'looks to whether the [spoiling party's] actions

8  impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the

9  rightful decision of the case.'"  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)

10  (quotation omitted).

11       Plaintiff's prejudice argument encapsulates concerns over the general integrity of

12  Defendants' discovery responses and whether any of those searches can be verified given

13  the loss of the hard drives.  (Doc. 188 at 21-22.)  Because the hard drives are missing,

14  Plaintiff "has no idea how many other key documents have been withheld or spoliated"

15  and "Plaintiff will never know since [the] hard drive[s] have been lost for some time."  (*Id.*

16  at 21.)  Defendants respond that "Plaintiff can make no showing of prejudice" because,

17  despite the loss of Henry's and Parsons's hard drives, those hard drives "were searched for

18  relevant and discoverable materials and evidence during discovery and documents were

19  identified and disclosed from these same hard drives in discovery—including the narrative

20  'Overview' document."  (Doc. 192 at 17.)

21       Defendants' arguments are unpersuasive.  To start, the concern over the loss of the

22  Business Case Documents prompted the Court's forensic imaging order.  That imaging

23  remains incomplete because of the loss of the hard drives.  Assuming the Business Case

24  Documents were a "living document" and Gibson could not remember who created the

25  document, it seems possible that a version of the document lived on Henry's or Parsons's

26  hard drive.  But the Court and Plaintiff will never have the answer to that question because

27  the hard drives are lost.

28       More problematic is that the Business Case Documents dispute, which arose in June

2021, eventually caused the PowerPoint to emerge as a belatedly produced document. (Doc. 153-3 ¶ 10 [production of the PowerPoint on January 14, 2022].)  Defendants do not dispute that the PowerPoint should have been disclosed far earlier.  (*Id.* at ¶ 23 ["The Business Case document is responsive to the MIDP disclosures; however Todd Gibson did not locate the Business Case document when he searched for documents and ESI during discovery."].)  Plaintiff never had the opportunity to question Fuelco (via Gibson), Henry, or Parsons about the PowerPoint because it was revealed after the close of discovery.

Separately, during the forensic imaging examination, Ankura located the Overview document (which, to be fair, was previously produced) in formerly undisclosed contexts—specifically, in emails between Henry, Gibson, and Parsons.  However, Plaintiff was never allowed to question those individuals about those emails because (1) they were not produced during discovery, (2) they were only discovered in the course of the court-ordered forensic imaging, and (3) Defendants continue to maintain that those emails are unresponsive.  (Doc. 192-1 at 3-4 ¶¶ 16-20.)  Admittedly, Parsons and Gibson were shown the Overview document during their depositions, but Plaintiff did not have the benefit of knowing the context in which that document had been shared between the Individual Defendants.  (*Id.* at 4 ¶¶ 18-20; Doc. 195-1 [original disclosure showing an email from Parsons to a "Lauren"].)  Also, a responsive, never-before-produced Excel document was uncovered during Ankura's forensic review.  (Doc. 192-1 at 4 ¶¶ 21-22.)

Finally, as noted, Defendants are unable to articulate when exactly the laptops were lost other than Henry's and Parsons's last days with Fuelco.  The supplemental declarations provided by Henry and Parsons recite generic and all-encompassing statements of searches without providing any specifics.  (*See* Docs. 200-3, 204-2.)

The bottom line is that the search for the Business Case Documents exposed additional documents, previously unknown to Plaintiffs, that should have been disclosed long ago.  Forcing Plaintiff to proceed to trial without an opportunity to further explore these newly uncovered documents, as well as the opportunity to probe further into Plaintiff's generic diligence recitations based on the hard drive spoliation, would

undoubtedly prejudice Plaintiff's trial preparation.

F.    **Intent To Deprive**

Turning back to subdivision (e)(2), the next relevant inquiry is whether the nonmovant "acted with the intent to deprive another party of the information's use in the litigation." "Destruction of evidence is willful spoliation if the party had some notice that the documents were potentially relevant to the litigation before they were destroyed. However, a court need not find that the party acted in bad faith, a finding of conscious disregard is enough for a court to issue an adverse inference instruction based on spoliation." *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 2022 WL 16551632, *15 (E.D. Cal. 2022) (cleaned up). "Courts may find intentional spoliation where it is shown, or reasonably inferred, that the spoliating party acted purposefully to avoid its litigation obligations." *Id.* Although Rule 37(e) does not define "intent," courts have found that "intent" exists in this context if "the evidence shows, or it is reasonable to infer, that a party purposefully destroyed evidence to avoid its litigation obligations." *Id.* at *11 (quoting *Facebook, Inc. v. OnlineNIC Inc.*, 2022 WL 2289067, *6 (N.D. Cal. 2022)). "Intent may be inferred if a party is on notice that documents were potentially relevant and fails to take measures to preserve relevant evidence, or otherwise seeks to 'keep incriminating facts out of evidence.'" *Colonies Partners, L.P.*, 2020 WL 1496444, at *9 (quotation omitted).

1.    The Parties' Arguments

Plaintiff argues that Defendants have engaged in a "pattern of abusive and deceptive litigation tactics and false and misleading representations relating to Defendants' hard drives and there is a clear nexus tying the hard drives to the merits of the case." (Doc. 188 at 23.)

Defendants respond that Plaintiff filed its motion prematurely, before the results of the forensic examination were known, and that the motion "falsely and intentionally exaggerat[es] claims of misconduct." (Doc. 192 at 2.) Defendants contend they engaged in "no wrongful conduct" and "certainly no 'extraordinary' conduct warranting any sanction." (*Id.* at 3.)

1    In reply, Plaintiff argues that "Defendants do not even attempt to explain or even

2  address their numerous misrepresentations" and "do not address the false and misleading

3  statements made under oath."  (Doc. 194 at 4-5.)

4                    2.    <u>Analysis</u>

5    The Court concludes, albeit with some hesitation, that Defendants did not act with

6  the intent to deprive Plaintiff of access to the Parsons and Henry hard drives.  Fung's

7  declaration explains that Defendants made various efforts to preserve the hard drives, only

8  for the hard drives to go missing due to missteps.  Defendants may have been negligent in

9  their preservation efforts, such that other antecedent inquiries under Rule 37(e) (*i.e.*,

10  whether they took reasonable steps to preserve) should be resolved against them, but a

11  negligent failure to meet preservation obligations is not the same thing as an intentional

12  plan to destroy evidence.

13    Plaintiff's intent arguments rely primarily on defense counsel's conduct throughout

14  the search for the Business Case Documents.  (*See, e.g.*, Doc. 188 at 10-16.)  This includes

15  defense counsel's emails, representations to the Court, declarations, and motion papers.

16  But that conduct, which is discussed in other portions of this order, occurred after the hard

17  drives were lost and does not bear on whether the loss of the hard drives itself was

18  intentional.  As the old adage goes, the cover up can be worse than the crime.

19    Focusing only on Defendants' conduct before and up to the time of the loss, the

20  evidence is that Defendants retained the hard drives after this case was filed, ran some post-

21  litigation discovery searches on the hard drives (Doc. 204-1 ¶ 5 [Parsons: "During the

22  course of this litigation which was first filed in July 2018, I conducted multiple searches

23  of my company laptop as part of my discovery."]; Doc. 204-2 ¶ 5 [Henry, same]), and then

24  lost track of the hard drives after Henry and Parsons left the company.  (Doc. 192-2 ¶¶ 12-

25  13.)  This timing suggests carelessness, rather than intentional spoliation.  Also, the laptops

26  were lost in July 2019 and January 2020, which is well before the Business Case

27  Documents dispute arose in June 2021.  (Doc. 192-2 at ¶¶ 12-13; Doc. 153-1 at 2 ¶ 2.)  It

28  is not as if the hard drives mysteriously went missing just after the dispute over the Business

Case Documents began or just after the Court ordered the forensic examination. *Colonies Partners, L.P.*, 2020 WL 1496444, at *9 ("Courts . . . consider the timing of the document loss when evaluating intent.").

There is also no evidence of coordination between Defendants. Parsons and Henry left Fuelco at different times. (Doc. 192-2 ¶¶ 12-13.) Fung avowed that Henry's name may have come up in Consilio's inventory search, but there's no concrete evidence of whether Parsons's name did. (*Id.* ¶ 20.)

Finally, it bears emphasizing that Defendants have not concocted an incredible or unbelievable explanation for how the hard drives were lost. Instead, it appears Fuelco strayed from its standard litigation hold procedure, instituted some short-cuts, and, possibly, can't quite remember why it proceeded in that manner. Thus, the Court finds by a preponderance of the evidence that Defendants did not act with the intent to deprive Plaintiff of the use of the hard drives.

G.    **Remedy**

1.    Rule 37(e)(2) Sanctions

Plaintiff has not established that Defendants acted with the intent to deprive in relation to the Parsons and Henry hard drives. Such a showing is a prerequisite to the imposition of the harsh sanctions enumerated in Rule 37(e)(2). Accordingly, the Court declines to impose the sanctions of default or an adverse inference in relation to the loss of Parsons's and Henry's hard drives.[13]

2.    Rule 37(e)(1) Sanctions

Under Rule 37(e)(1) "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice."

---

[13]    To be clear, this ruling only applies to Plaintiff's request for Rule 37(e)(2) sanctions in relation to the Parsons and Henry hard drives. Because, as discussed in Part III.A.1 above, the Court has not yet reached any determination as to whether the Business Case Documents were lost—instead, discovery is being reopened in part so that issue can be further developed—any analysis as to the propriety of Rule 37(e)(2) sanctions based on the loss of that category of ESI would be premature.

To cure the harm here, Plaintiff has requested that the Court reopen discovery "to allow Plaintiff an opportunity to probe Defendants' prior discovery and seek discovery of Defendants' emails and hard drives anew through a court-supervised process in which that ESI is examined by experts for responsive documents." (Doc. 188 at 23-24.)  Defendants oppose this request, arguing that Plaintiff made repeated requests to reopen discovery before this "recent attempt" (Doc. 192 at 2-3) and that "Plaintiff has already completed expert searches of Defendants' email accounts and Todd Gibson's hard drive for 'responsive documents'" and there is "no basis for yet another wholesale search conducted by yet another expert" (*id.* at 17-18).

Plaintiff has the better of this argument.  Reopening discovery is a measure no greater than necessary to cure the prejudice to Plaintiff.  New, potentially important documents have been uncovered and disclosed since the close of discovery, and Plaintiff should be allowed to depose the relevant actors about those documents.

The Court is also sensitive to Plaintiff's argument that there are reasons to be skeptical of the overall comprehensiveness of Defendants' discovery efforts.  It is concerning, to put it mildly, that Parsons did not locate the PowerPoint (even assuming it is the Business Case Documents) during his initial searches.  Separately, even more new, previously undisclosed documents came to light during the forensic examination (which Plaintiff vociferously opposed and swore was unnecessary).  Finally, although Parsons and Henry have submitted declarations avowing that they conducted some searches of the hard drives before the loss, these declarations are too vague and non-specific to create any confidence in the thoroughness of their searches.

As additional remedies, the Court will order Defendants to disclose (1) the native version of the PowerPoint, so the parties can follow up on some of the uncertainties and unresolved questions identified in Part III.A.1 above; and (2) all non-privileged emails from January 1, 2018 through April 30, 2018 in which two or more of Gibson, Parsons, Henry, and Reinesch was a sender or recipient (including cc's).[14]

---

[14]     Plaintiff requested the addition of this second category during oral argument, and the Court agrees it is warranted for the reasons stated during oral argument.  Although these

Defendants also include an undeveloped request for an evidentiary hearing in the final sentence of their response brief.  (Doc. 192 at 18.)  This request is denied without prejudice.  For one thing, it is unclear what evidence Defendants could offer at an evidentiary hearing to dispute the finding of ESI destruction related to Henry's and Parsons's hard drives.  More important, in light of the reopening of discovery, an evidentiary hearing would be premature.  *Cf. Paladin Assocs, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164-65 (9th Cir. 2003) ("Paladin is correct that Rule 37(c)(1) permits a court to impose sanctions only 'after affording an opportunity to be heard.'  However, conforming to the rule does not require an evidentiary hearing in every case. . . .").  If, following the reopened discovery process, Plaintiff renews its request for Rule 37(e)(2) sanctions based on the loss of the Business Case Documents (or on some other basis), an evidentiary hearing might be warranted at that time.

Finally, the Court is not persuaded that a full-scale forensic examination is warranted to address the prejudice.  The Court is concerned that the Overview document (Doc. 195-1) was found attached to emails between Gibson, Parsons, and Henry, yet those emails were not previously disclosed.  (Doc. 194 at 4 ["The Opposition and (currently incomplete) forensic examination also confirms that Defendants withheld critical emails between Gibson, Parsons, and Henry attaching a 'narrative' Word document regarding the business case for Fuelco's expansion.  Defendants still do not have those emails, or other likely responsive emails located by Ankura."].)  Further, the PowerPoint was not disclosed until after the close of discovery.  But these discrete items are amenable to a discrete resolution—namely, production of a native version of the PowerPoint, production of the emails attaching the Overview document (as well as other emails from a discrete timeframe involving Gibson and the Individual Defendants), new depositions, and the discovery of more information concerning the details of the searches performed on the hard drives.

…

emails may fall outside the scope of the forensic examination as initially authorized, subsequent developments suggest that the Court should err on the side of inclusion.

1

2

### H.    Costs & Fees

Both sides have requested fees and costs.  (Doc. 188 at 24; Doc 192 at 18.)

The Court awards fees and costs to Plaintiff.  Defendants do not dispute that fees are legally available in this circumstance[15] and, contrary to Defendants' assertion (Doc. 192 at 2), Plaintiff has not prematurely come running to the Court for assistance.

As for the scope of the award, Plaintiff should be allowed to recover the reasonable costs and fees associated with bringing both sanctions motions, as well as the costs of the forensic examination.  The controversy regarding the Business Case Documents has been live since June 2021.  After Defendants dragged their feet for months, repeatedly failing to respond to emails from Plaintiff's counsel requesting more information and then belatedly producing the PowerPoint, Plaintiff was forced to file the first sanctions motion.   In response, Defendants swore that nothing was amiss and that there was no need for a forensic examination.   Those assurances were inaccurate—the forensic examination revealed the existence of additional undisclosed documents, plus the loss of the Parsons and Henry hard drives came to light.  This prompted the second sanctions motion, which Defendants again oppose without substantial justification—even if Plaintiff's request for terminating sanctions is too severe, it is hard to see how Defendants could, with a straight face, oppose any reopening of discovery, which is the position they initially took.  (Doc. 192 at 3 ["There are no bases for spoliation sanctions and there is utterly no basis for default judgment or the re-opening of discovery."].)  Nor are there any extenuating circumstances that would make an award of attorneys' fees unjust, especially given that the sanctions being imposed here are on the mild end of what Plaintiff sought.  In a related vein, the Court is unpersuaded by Defendants' contention, during oral argument, that the fee award should be limited to some percentage (say, 20%) of the reasonable costs and fees that Plaintiff incurred.  Even though Plaintiff may have overreached by seeking terminating

---

[15]    Even if Defendants hadn't forfeited the issue, the Court would find—as discussed in more detail at the outset of Part III of this order—that an award of costs and fees is appropriate under Rule 37(e)(1) as a "measure no greater than necessary to cure the prejudice" to Plaintiff.

1   sanctions, Plaintiff has acted reasonably overall in seeking answers and information from

2   Defendants and, ultimately, judicial relief.

3          Accordingly,

4          **IT IS ORDERED** that Plaintiff's motion for sanctions (Doc. 188) is **granted in**

5   **part and denied in part**.

6          **IT IS FURTHER ORDERED** that discovery is reopened on the limited terms

7   discussed elsewhere in this order.  As part of the reopened discovery process, Plaintiff may

8   redepose Parsons, Henry, and Fuelco.  Before those additional depositions, and within 21

9   days of the issuance of this order, Defendants must produce (1) a native version of the

10  PowerPoint; (2) the emails to which the Overview document was attached; and (3) all non-

11  privileged emails from January 1, 2018 through April 30, 2018 in which two or more of

12  Gibson, Parsons, Henry, and Reinesch was a sender or recipient (including cc's).  The

13  parties are encouraged to complete the reopened discovery process expeditiously, so as not

14  to further postpone the trial in this case, which is set to begin on October 10, 2023.

15         **IT IS FURTHER ORDERED** that Defendants pay Plaintiff's reasonable

16  attorneys' fees and costs associated with bringing both motions for sanctions, as well as

17  the costs of the forensic examination.  The parties must meet and confer about the size of

18  the fee award and by whom it must be paid.  If the parties cannot resolve the matter,

19  Plaintiff must file a motion (and supporting evidence) within 14 days of this order.

20  Defendants' response must be filed within 14 days of the motion.  No reply may be filed.

21         Dated this 11th day of April, 2023.

22

23

24  _____

25  Dominic W. Lanza
    United States District Judge

26

27

28